Robert J. **POUND**, Plaintiff,

v.

**AIROSOL COMPANY, INC.**, Defendants.

No. CIV.A.02–2632–CM.

United States District Court, D. Kansas.

March 10, 2004.

---

Brett E. Nelson, George McCorkell Plews, Leonardo D. Robinson, Plews Shadley Racher & Braun, Indianapolis, IN, Jeffrey J. Simon, Ronald D. Marney, II, Husch & Eppenberger, LLC, Kansas City, MO, for Plaintiff.

Aaron C. McKee, John W. Cowden, Paul S. Penticuff, Baker, Sterchi, Cowden & Rice, L.L.C., Kevin J. Odrowski, Kansas City, MO, Amy E. Rager, Richmond M. Enochs, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff brings suit against defendants under the citizen suit provision, 42 U.S.C. § 7604(a)(1), of the Clean Air Act, 42 U.S.C. § 7401 *et seq.,* alleging violations of emissions standards set forth by the Clean Air Act. Specifically, plaintiff alleges that defendant Airosol Company, Inc. ("Airosol") violated the Clean Air Act by manufacturing, selling, and distributing the pesticide, Black Knight, and that Chad Brown, Robyn Markland, Pro Exotics, Inc., Pro Exotics Reptiles, Inc. (the "Pro Exotics defendants"), and Tim Samra individually and d/b/a Tribal Reptile Co. (the "Tribal defendants") violated the Clean Air Act by selling and distributing Black Knight. This matter comes before the court on Plaintiff's Motion for Partial Summary Judgment (Doc. 70).

### I. Factual Background

Defendant Airosol is a Kansas corporation, with its principal place of business located in Neodesha, Kansas. Airosol manufactures, advertises, distributes, and sells the pesticide, Black Knight. The Pro Exotics defendants, located in Colorado, and the Tribal defendants, located in California, sell and distribute Black Knight.[1]

Black Knight is registered under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") (EPA Reg No. 901–82) for treatment of various household pests. Black Knight is not registered or approved for use in the treatment of snake mites or other pests that affect reptiles or other cold blooded animals or for direct use on animals. At some time prior to January 1, 1994, Black Knight was registered and approved under FIFRA as a pesticide for use in aircraft disinsection-a

---

1. The Tribal defendants denied in their answer that they sell or distribute Black Knight but plaintiff asserts that they have admitted to this fact in their Rule 26 disclosures.

process by which aircraft and passengers were sprayed with an aerosolized pesticide during flight or before disembarking the aircraft to eliminate various agricultural pests. Airosol, however, never sold Black Knight as an aircraft pesticide; instead, Airosol sold a formulation identical to Black Knight, but called "Airosol Aircraft Insecticide," which Airosol used as an aircraft disinfectant.

Black Knight is an aerosol product that contains hydrochlorofluorocarbons 22 and 142b (monochlorodifluoromethane and monochlorodifluoroethane, respectively), both of which are Class II substances as defined by section 602(b) of the Clean Air Act, 42 U.S.C. § 7671a(b). The Clean Air Act bans use of Class II substances unless a manufacturer has applied, prior to January 1, 1994, for an exception or exemption as set forth by statute or regulation. The granting of such an exemption allows the manufacture, sale, and distribution of Black Knight under certain conditions.

Airosol alleges that it submitted a request, dated December 22, 1993, for an exemption for Black Knight. However, the Environmental Protection Agency's ("EPA") FIFRA file on Black Knight has no record of such a request. Further, by letter dated August 19, 2002, EPA issued a Section 114, 42 U.S.C. § 7414(a)(1), request to Airosol requiring Airosol to submit information regarding Airosol's manufacture, sale, and distribution of aerosol products or other pressurized dispensers which contain a class I or class II substance. Airosol, by letter dated December 19, 2002, responded to the EPA's Section 114 request and alleged that it had requested an exemption for Black Knight in December 1993 but that it had received no correspondence from EPA regarding that request. Since the time of its alleged application for exemption, Airosol has filed its yearly Pesticide Report for Pesticide-Producing Establishments with the EPA

and has included Black Knight on its report.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## B. Clean Air Act

The 1990 Amendments to the Clean Air Act included provisions to phase out the use of ozone-depleting substances. In part, the Clean Air Act provides that, "[e]ffective January 1, 1994, it shall be unlawful for any person to sell or distribute, or offer for sale or distribution, in interstate commerce-(A) any aerosol product or other pressurized dispenser which contains a class II substance." 42 U.S.C. § 7671i(d)(1)(A); *see also* 40 C.F.R. § 82.64(d) (disallowing the distribution or sale of any product categorized as "nonessential," which is defined as an "aerosol product or other pressurized dispenser which contains a class II substance."). Class II substances are those listed by statute at 42 U.S.C. § 7671a(b) or as added by the EPA Administrator (the "Administrator") at a later date. *See* 42 U.S.C. § 7671a(c) (delegating this responsibility to the Administrator); 40 C.F.R. Pt. 82, Subpt. A, App. B. (providing the updated list of class II substances).

The Administrator may grant an exception to the § 7671i(d)(1)(A) prohibition where:

> (A) the use of the aerosol product or pressurized dispenser is determined by the Administrator to be essential as a result of flammability or worker safety concerns, and
>
> (B) the only available alternative to use of a class II substance is use of a class I substance which legally could be substituted for such class II substance.·

42 U.S.C. § 7671i(d)(2).

A distributor or seller of a product prohibited by the class II ban may also qualify for a temporary product reformulation exemption. 40 C.F.R. § 82.65(b), (c). The reformulation exemption allows for an additional period of time in which a nonessential product can be distributed or sold following the approval or denial of an application for product reformulation.[2] *Id.* In order to qualify for the reformulation exemption, an application for reformulation must have been submitted to the EPA prior to January 1, 1994. *Id.* What neither statute nor regulation makes clear, however, is whether the reformulation exemption is in effect during the entire period of time in which the application is pending to the EPA awaiting the agency's decision. On September 27, 1993, the EPA issued a notice of proposed rulemaking seeking

---

2. In certain circumstances, a temporary exemption also exists for substances that are used as an aircraft pesticide. *See* C.F.R. § 82.65(f). Plaintiff assumed, because Airosol has manufactured and packaged an aircraft insecticide of the same formulation as Black Knight, that Airosol may assert the aircraft pesticide exemption. However, Airosol has made clear that it does not rely on this exemption to manufacture and sell Black Knight.

public comments on the agency's plan to expand the time period of the reformulation exemption to include the time necessary for the agency to make its decision of whether to approve or deny the application. Protection of Stratospheric Ozone, 58 Fed.Reg. 50464, 50471. However, the EPA's proposed rule was not finalized as part of 40 C.F.R. § 82.65(b), (c). Nevertheless, for purposes of this summary judgment, the court will assume that the reformulation exemption runs during the time period necessary for the EPA to make its decision, as long as the applicant "properly submitted" its application to the EPA "prior to January 1, 1994." 40 C.F.R. § 82.65(b), (c).

## III. Analysis

### A. Airosol

There is no controversy over the fact that Black Knight contains class II substances banned by the Clean Air Act. Instead, at issue is whether Airosol "timely and properly submitted to the approving federal agency [ (the EPA) ] prior to January 1, 1994," an application for a reformulation exception. See 40 C.F.R. § 82.65(b), (c). Plaintiff alleges that Airosol has produced no evidence that EPA received Airosol's application for reformulation prior to January 1, 1994, or even that Airosol ever filed such a request with the EPA. Airosol's failure, plaintiff argues, is evidenced by the absence of such an application on file with the EPA, which has apparently prompted the agency to issue a Section 114 request on Airosol, and because Airosol has produced no evidence of any correspondence in which EPA even acknowledged receipt of the application.

■ Airosol contends that summary judgment is not appropriate because it has put forth evidence that creates a genuine issue of material fact that only a jury can decide. In particular, Airosol presents its Exhibit B, a one-page copy of an EPA form entitled "Application for Pesticide" and dated December 22, 1993, that Airosol alleges was its application for reformulation of Black Knight. The form does not indicate that it was an application for reformulation or that it relates to Black Knight. More importantly, Airosol's Exhibit B is an unauthenticated document. Airosol presents the affidavit of its President, Carl Stratemeier, who asserts that on December 22, 1993, Airosol sent the "appropriate documentation" as part of an application for a reformulation exception. However, nowhere in the affidavit does Stratemeier identify Exhibit B or indicate that it was part of Airosol's application for reformulation. Absent proper authentication, therefore, Exhibit B is inadmissable and not properly considered by the court in a motion for summary judgment. See Fed.R.Civ.P. 56(e); D. Kan. Rule 56.1.

■ Next, Airosol asserts that Stratemeier's affidavit creates an issue of material fact as to whether Airosol properly submitted its application to the EPA. First, Stratemeier states that: "On or about December 22, 1993, Airosol sent to the EPA the appropriate documentation requesting a reformulation of 'Black Knight.'" (Stratemeier Affidavit ¶ 1). Airosol never received any indication that EPA had received the application, and EPA never communicated with Airosol about Black Knight until the agency issued a Section 114 information request in August 2002. Airosol, therefore, sold a pesticide containing banned class II substances for nearly nine years without any acknowledgment from EPA of the receipt or consideration of Airosol's application for reformulation. Stratemeier asserts that during that time Airosol made "numerous" phone calls to the EPA, which they contend solicited no responses, although apparently Airosol made no effort to document these attempts

or correspond in writing with the agency on the status of their alleged application.

In a motion for summary judgment, after a movant carries its burden to demonstrate a lack of evidence for the other party's claim, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. The nonmoving party, therefore, must present evidence that creates a dispute of material fact such that a reasonable jury could find for that party. As evidence that it "properly submitted" its application to the EPA "prior to January 1, 1994," pursuant to 40 C.F.R. § 82.65(b), (c), Airosol contends that it mailed the proper documents on December 22, 1993.[3] Even assuming that Airosol's contention is true, no reasonable jury could find that Airosol met its responsibility to properly submit its application before January 1, 1994.

The purpose of the reformulation exemption is to allow manufacturers to sell their remaining inventory of substances containing banned class II substances before switching to a reformulation alternative. As Airosol asserted in its motion, the actual time during which a manufacturer could sell products containing class II substances could be extended in practice to include the time necessary for the EPA to make a decision regarding an application for reformulation. *See* Defendant Airosol's Response to Motion for Summary Judgment (Doc. 104), at 6. Indeed, Airosol quoted the EPA's policy statement that: " 'EPA understands that it is sometimes a very time-consuming process to obtain federal approval for product reformulation.' " *Id.* (quoting 58 Fed.Reg. 50464, 50471 (1993)). However, the very next sentence that Airosol correctly excerpted states: " 'For instance, EPA approval for pesticide reformulations under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) may take *up to a year.*' " *Id.* (emphasis added).[4]

Airosol was obligated to apply prior to January 1, 1994, in order to qualify for a *temporary* exemption to the ban on selling products containing class II substances. Even assuming that Airosol mailed an application on December 22, 1993, Airosol could not reasonably conclude that it would take the EPA nearly a decade to make a decision about whether to grant Airosol the typical 45 or 90 additional days to manufacture Black Knight. At the most, given the EPA's policy statement, Airosol could have expected to sell Black Knight for approximately a year while awaiting a decision and then being granted a 45 or 90 day exemption to continue manufacturing, selling, and distributing Black Knight in its original formulation. Airosol was responsible for properly submitting the application in order to take advantage of the reformulation exemption, but it took no formal or documented steps to contact the EPA during the entire nine years; Airosol cannot avoid summary judgment by now claiming that it mailed the "appropriate" documents and that the EPA must have lost the paperwork. Examining all the inferences in favor of Airosol, the court

---

3. Even if the court were to consider Airosol's inadmissable Exhibit B and assume that it was a photocopy of Airosol's alleged reformulation exemption application, the court's analysis would not change. Exhibit B does not offer fact or evidence beyond that contained in Stratemeier's affidavit.

4. The subject matter of the present suit involves the Clean Air Act, while the quoted language relates to FIFRA. The court does not conclude that one year is the absolute deadline for the EPA to respond to an application for reformulation under the Clean Air Act, but finds the analogy to the potential delay under FIFRA useful to the matter at hand.

finds that no reasonable jury could find that Airosol met its burden to properly file an application for reformulation by January 1, 1994. The court therefore concludes that, as a matter of law, Airosol's manufacture, sale, and distribution of Black Knight violated the Clean Air Act.

### B. Pro Exotics Defendants

█ The Pro Exotics defendants assert that summary judgment should not be granted against them because they did not manufacture Black Knight and because Airosol had properly requested a reformulation exemption for Black Knight. There is no dispute that the Pro Exotics defendants sold and distributed Black Knight.

The court already has concluded that Airosol did not properly and timely file for a reformulation exemption to sell Black Knight. Additionally, as the Clean Air Act makes clear, it is "unlawful for any person to sell or distribute, or offer for sale or distribution, in interstate commerce-(A) any aerosol product or other pressurized dispenser which contains a class II substance." 42 U.S.C. § 7671i(d)(1)(A). It is an undisputed fact that Black Knight contains banned class II substances; therefore, the court grants plaintiff's motion for summary judgment as to the Pro Exotics defendants and concludes that, as a matter of law, these defendants' sale and distribution of Black Knight violated the Clean Air Act.

### C. Tribal Defendants

The Tribal defendants have not responded to plaintiff's motion for summary judgment. Further, the Tribal defendants apparently have asserted conflicting statements about their sale and distribution of Black Knight. In their answer they deny the allegation, while in their Rule 26 disclosures, plaintiff contends, they admit to the sale and distribution of Black Knight.[5]

The court concludes that it will grant the Tribal defendants an additional 11 days from the effective date of this Order to file their response to plaintiff's motion for summary judgment. Plaintiff will then have the prescribed 20 days in which to file a reply, including any additional exhibits. Failure by the Tribal defendants to file a response by that time will cause the court to consider and decide plaintiff's motion as unopposed, pursuant to D. Kan. Rule 7.4.[6]

### IV. Order

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 70) is granted as to Airosol and the Pro Exotics defendants.

**IT IS FURTHER ORDERED** that the Tribal defendants file a response to plaintiff's motion for summary judgment within 11 days from the effective date of this Order.

---

5. The parties' Rule 26 disclosures are not currently a part of the summary judgment record.

6. D. Kan. Rule 7.4 states, in part: "If a respondent fails to file a response within the time required by Rule 6.1(e), the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice."